**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 10-cv-02783-CMA-KMT

PAMELA ARMSTEAD

Plaintiff,

v.

DONALD WOOD, and
CITY AND COUNTY OF DENVER,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. # 60.) In this case, Plaintiff Pamela Armstead ("Plaintiff") brings suit against her former employer, the City and County of Denver, and her former supervisor, Donald Wood (collectively "Defendants"). Plaintiff alleges that Defendants discriminated against her on the basis of race and age, as well as retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, 1983, 1988, 2000e, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. (Doc. # 45.) Jurisdiction is proper under 28 U.S.C. § 1331.

## I. BACKGROUND

The following facts are undisputed, unless otherwise noted. The Court will elaborate, as needed, in its analysis section.

Plaintiff, an African-American female over the age of 60, was employed by the City and County of Denver ("the City") at Denver International Airport ("DIA") from November 1, 1995, until she retired on November 1, 2010.[1] (Doc. # 61 at 1, ¶¶ 1-2.) In January 2006, Plaintiff became a Senior Agency Budget Analyst, a position she retained until her retirement. (Doc. # 61 at 1, ¶ 3.) From April 2010, through her retirement, Plaintiff was supervised by Donald Wood ("Defendant Wood"). *Id.* Although Plaintiff's specific job responsibilities are disputed, at a minimum, Plaintiff had some role in the submission of grant requests to the Federal Aviation Administration ("FAA"). In an affidavit, Plaintiff says that she "participate[d] in a series of activities that facilitated grant requests, grant reimbursement requests, and grant filings to the FAA." (Doc. # 61-1 at 14, ¶ 2.) In an email message to Defendant Wood, Plaintiff characterized herself as "the main person responsible for the grant process." (Doc. # 60-1; 60-2 at 192.)

On September 18, 2009, Plaintiff's supervisor at the time, Woods Allee, forwarded Plaintiff a message from the FAA regarding American Recovery and Reinvestment Act ("ARRA") 1512 Reporting Information. Plaintiff acknowledged that 1512 was one of the reports that she was responsible for submitting to the FAA. Over the next several weeks, Plaintiff received several messages regarding the proper templates to use for the 1512 report and that October 10, 2009, was the deadline for the submission of the report. Although Plaintiff denies that she was "solely responsible,"

[1] Plaintiff claims she was "constructively discharged." The Court will discuss the merits of this claim in the analysis section.

Plaintiff admits that she did not submit the 1512 report by the October 10, 2009 deadline. (Doc. # 60, ¶ 10.) As of December 4, 2009, DIA had not yet submitted a 1512 report that complied with the ARRAs' templates, and Denver was listed as one of four Non-Reporters from the previous quarter. (Doc. # 60 at 3-4, ¶ 11.) Plaintiff acknowledged that DIA's failure to comply with the grant regulations was a "big deal" that could jeopardize future grants. (*Id*. at 4, ¶ 13.)

In August 2010, the City Auditor's Office issued a Performance Audit for DIA's Airport Improvement Program ("AIP") for the period of January 1, 2009 through December 31, 2009. (Doc. # 60-20.) The Performance Audit found "several weaknesses" in the AIP Grant Management and Administration. (Doc. # 60-20 at 17.) Relevant to this case, the Performance Audit stated that the "Grant Administrator" was responsible for "reviewing and approving the transmittal of the reimbursement requests for the Federal share of the AIP projects," yet the Audit found that "there was no signature or evidence of review by the Grant Administrator contained in the 2009 reimbursement requests." (Doc. # 60-20 at 17.) Although Plaintiff denies being the responsible person, the exhibit she attaches to support her assertion, a Comprehensive Organizational Study of DIA Grants Management Practices, expressly states that Plaintiff is the "Grant Administrator." (Doc. # 62-1 at 5.)

Defendant Wood became Plaintiff's supervisor in April of 2010. In or around August 2010, Plaintiff told Defendant Wood that she was concerned about the manner in which he was allocating federal grant funds to various DIA budget accounts. Plaintiff

alleges that, as a result, Defendant Wood ridiculed and insulted her, excluded her from meetings, and removed her from the “work flow” chart, all of which made it difficult for Plaintiff to perform her job duties.[2] Plaintiff also alleges that she orally informed Defendant Wood that she believed he was discriminating against her on the basis of race. Additionally, she told Laura Trujillo, a co-worker, that she believed Defendant Wood was discriminating against her on the basis of race. Plaintiff alleges that Defendant Wood told her that, in September 2010, if she failed to meet any deadlines, he would consider it to be insubordination. In response, Plaintiff told Defendant Wood that he was discriminating against her on the basis of her race and treating her like a slave. (Doc. # 61 at 4, ¶¶ 18-19.)

Defendants dispute that Plaintiff ever told Defendant Wood that she believed he was discriminating against her. (Doc. # 69 at 3, ¶¶ 16, 19.) Defendants allege that Plaintiff was uncooperative during this time, an allegation that is disputed by Plaintiff, but supported by the evidence. For example, in a June 24, 2010 email to Ms. Trujillo, Plaintiff stated that she would refuse to attend an AIP meeting until she found out why Defendant Wood wanted to meet with the auditor’s office. *Id.* On June 28, 2010, Defendant Wood sent Plaintiff a message requesting a list of job duties so he could complete her Performance Evaluation Plan (“PEP”). (Doc. # 60, ¶ 23.) In response, Plaintiff stated, “I have no PEP for the past 6 years.” *Id.* At her deposition, Plaintiff admitted this statement was false. *Id.* Furthermore, Margo Blu, who also worked under

[2] Defendants dispute these allegations, and have provided evidence showing that Plaintiff was not excluded from the “work flow” chart. (Doc. # 69 at 3, ¶ 15, Doc. # 69-5.)

Defendant Wood, testified in a deposition that Plaintiff was often disagreeable during meetings with Defendant Wood. (Doc. # 60, ¶ 42.)

Defendant Wood alleges that, in addition to Plaintiff's purported insubordination, Plaintiff was often difficult to locate during work hours. (Doc. # 60, ¶ 24.) As a result, on or about September 27, 2010, Defendant Wood requested that Human Resources ("HR") investigate Plaintiff's attendance. *Id.* Gabriele Bankers, a Senior HR Professional, obtained both Plaintiff's time keeping records from the City's KRONOS system and Plaintiff's badge records that tracked her presence in the office. (Doc. ## 60-25, 60-26, 60-27.) Ms. Bankers' investigation revealed that Plaintiff, on at least eight occasions (June 25, July 7, July 14, July 30, August 26-27, September 13, and October 8), had entered eight hours of work into the KRONOS system when Plaintiff's badge records showed that she had never been at work.[3] (Doc. # 60, ¶ 26.) Furthermore, a comparison of Plaintiff's KRONOS time keeping records and her badge records showed numerous other occasions where Plaintiff worked fewer hours than she reported. *Id.* Additionally, Ms. Bankers investigated Plaintiff's internet usage from June 1, 2010 through September 27, 2010, and found that Plaintiff had more than 80,000 internet hits for websites not related to her work.[4] (Doc. # 60, ¶ 27.)

On September 30, 2010, Defendant Wood informed Plaintiff and Ms. Blu that they would be relocated to the eighth floor. (Doc. # 60, ¶ 28.) Plaintiff complained

---

[3] In her affidavit, Plaintiff denies the allegation that she claimed time for hours not worked. However, other than her affidavit, she has offered no evidence in support of her denial.

[4] Although Plaintiff denies she misused the internet, she has offered no evidence besides her self-serving affidavit.

vigorously about the move, and later sent an email message to Defendant Wood saying that she did "not understand why we have to be on the 8th floor." (Doc. # 60, ¶ 29.) On the same day, Plaintiff wrote her sister, stating: "[j]ust lost my temper real bad at work today. The devil is in full force here." (Doc. # 60, ¶ 30.) On October 1, Plaintiff went to Mr. Eric Hiraga, Defendant Wood's supervisor, and threatened legal action, referencing a 2006 lawsuit and a supposed agreement (never produced) allegedly guaranteeing her a tenth floor office. (Doc. # 60, ¶ 30; Doc. # 61-11.) In an email message to Defendant Wood, Mr. Hiraga described Plaintiff as "hostile, rude, and disrespectful." Mr. Hiraga also stated that Plaintiff "muttered something about discriminatory practices within the AOB and referred to a lawsuit in 2006." (Doc. # 61-11.) Also on October 1, 2010, Defendant Wood sent an email message to Plaintiff and Ms. Blu that the move date would be October 14, 2010 (later changed to October 15, 2010). (Doc. # 60-32.) On October 13, 2010, Plaintiff informed Defendant Wood that she would not be ready for the move, took October 14th and 15th off from work, and left her door locked. (Doc. # 60 at 8, ¶ 31.)

In October 2010, Defendant Wood determined that Plaintiff would receive a "failing rating" on her Performance Evaluation Program Report ("PEPR") for the period from November 2009 through November 2010. (Doc. # 60, ¶¶ 32, 33.) On October 25, 2010, Defendant Wood sent Plaintiff a letter informing her that her PEPR was expected to be failing. (Doc. # 60, ¶ 32.) He also stated that there would be a meeting to review the PEPR on November 2, 2010. *Id.* On that date, the City also placed Plaintiff on paid

investigatory leave due to the HR investigation into Plaintiff's abuse of time records and the internet. (Doc. # 60, ¶ 34.)

On October 26, 2010, Plaintiff's counsel sent an email message with an attached letter to Kim Day, the Manager of Aviation at DIA, alleging that Plaintiff was being retaliated against for complaining about racial discrimination to Mr. Allee and to Defendant Wood. The letter also indicated that Plaintiff would settle her dispute "by retiring in exchange for financial compensation comparable to that received by other long term City employees."[5] (Doc. # 60-37.) One or two days later, Defendant Wood mailed Plaintiff a pre-disciplinary letter, which listed potential violations of Career Service Authority ("CSA") rules, informed her that she may be subject to discipline, and notified her that a pre-disciplinary meeting was scheduled for November 9, 2010. (Doc. # 60, ¶ 36.)

Plaintiff retired on November 1, 2010, one day before the scheduled meeting to discuss her failing PEPR and eight days before the meeting to discuss her violations of CSA rules. (Doc. # 60, ¶ 38.)

On September 1, 2011, Plaintiff filed her Second Amended Complaint. (Doc. # 45.) Defendants filed their Motion for Summary Judgment on January 31, 2012. (Doc. # 60.) Plaintiff responded on February 24, 2012, and Defendants' replied on March 19, 2012. (Doc. ## 61, 69.)

[5] The letter was not addressed to Defendant Wood and he did not recall seeing the email message. (Doc. # 60, ¶ 35.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A dispute is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. at 670-71. In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id*. at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 256. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Notably, "generalized, conclusionary, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir. 1975); *see also Garret v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) ("We do not consider conclusory and self-serving affidavits."); 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.41[1][c] (3d ed. 2011) ("Merely restating a pleading, submitting new pleadings, or making bald assertions in a legal memorandum, or even in an affidavit, will not enable the nonmovant to withstand a properly supported summary judgment motion.").

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III. ANALYSIS

Plaintiff alleges that Defendant Wood discriminated against her on the basis of race. Additionally, Plaintiff claims Defendant Wood retaliated against her because she

complained of the alleged racial discrimination. In addition to the claims against Defendant Wood, Plaintiff has also brought claims against Defendant City for violations of 42 U.S.C. §§ 1981 and 1983, Title VII, and the ADEA. At the outset, the Court notes that in order to bring §§ 1981 and 1983 claims against the City, Plaintiff "must demonstrate that the City's officials acted pursuant to a 'custom or policy' of 'discriminatory employment practices.'" *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (citation omitted). Plaintiff has not presented any evidence that Defendant Wood's actions were taken pursuant to a custom or policy, nor has Plaintiff responded to the portion of Defendants' motion for summary judgment in which Defendants point out the lack of evidence of custom or policy. As there is no genuine dispute of material fact as to whether Defendant Wood acted pursuant to a custom or policy, summary judgment is appropriate on Plaintiff's §§ 1981 and 1983 claims against Defendant City.

With respect to the remaining claims, the Court applies the familiar *McDonnell Douglas* burden-shifting analysis because Plaintiff attempts to prove her claims through circumstantial evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Crowe v. ADT Sec. Services, Inc.,* 649 F.3d 1189, 1195 (10th Cir. 2011) (applying *McDonnell Douglas* to racial discrimination and retaliation claims); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (applying *McDonnell Douglas* to ADEA discrimination claims).

Under the *McDonnell Douglas* approach, Plaintiff must first establish a *prima facie* case of discrimination or retaliation by Defendants. If Plaintiff can do so, the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for the adverse employment action. *Crowe,* 649 F.3d at 1195. If Defendants articulate such a reason, the burden shifts back to Plaintiff to demonstrate that the defendant's proffered reason is pretextual. *Id.*

Even viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to set forth facts showing that there exists a genuine dispute for trial because she cannot establish a *prima facie* case of race or age discrimination, nor can she establish a *prima facie* case of retaliation. Thus, summary judgment is appropriate on all of Plaintiff's claims.

**A. RACIAL DISCRIMINATION CLAIM**

To establish a *prima facie* case of discrimination, Plaintiff "must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)). Although Plaintiff, an African-American female, is a member of a protected class, she has not shown that she suffered an adverse employment action.

An adverse employment action "must be materially adverse to the employee's job status." *Fischer v. Forestwood Co., Inc.,* 525 F.3d 972, 979-80 (10th Cir. 2008) (quoting *Duncan v. Manager, Dep't of Safety, City & Ctny. of Denver,* 397 F.3d 1300, 1314 (10th

Cir. 2005)). Adverse employment actions are acts that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Actions that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may also rise to the level of an adverse employment action. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004). However, mere inconveniences or alterations of job responsibilities do not constitute adverse employment actions. *See Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). Thus, although "adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

Plaintiff claims that she suffered numerous adverse employment actions. Specifically, she claims that (1) she was excluded from the work flow chart and meetings; (2) she was falsely accused of being solely responsible for DIA's failure to timely and correctly submit reports to the Federal government; (3) she was suspended from her job; (4) she was falsely accused of gross misconduct relating to lying about her time records and internet usage; (5) she was given a failing job performance evaluation, which threatened her with termination; and (6) she was constructively discharged.

(Doc. # 61 at 15.) These actions are either not adverse, or not supported by evidence, or both.

With respect to Plaintiff's allegation that she was excluded from the work flow chart, the evidence shows that Plaintiff, in fact, was not excluded. (Doc. # 69 at 3, ¶ 15.) With respect to her allegations that she was excluded from meetings, Plaintiff fails to describe the meetings from which she was excluded, how her absence from these meetings affected her job performance, or how this adversely affected her employment. In any event, even if Plaintiff was in fact excluded from the work flow chart or from meetings, such exclusions would not constitute adverse employment actions. *See, e.g.*, *Petersen v. Utah Dept. of Corr.,* 301 F.3d 1182, 1189-90 (10th Cir. 2002) (holding that being "out of the information loop" and not provided with information might have been offensive to the plaintiff but it was not a "materially adverse employment action.").

With respect to Plaintiff's allegation that Defendants falsely accused Plaintiff of being "solely" responsible for DIA's failure to timely and correctly submit reports to the Federal government, Plaintiff has not provided any evidence to support this allegation. (Doc. # 69 at 6, ¶ 10.) Defendants, in contrast, have presented evidence showing that Plaintiff's duties included submitting grant reports, and that she failed to do so in a timely and sufficient manner. (Doc. # 60, ¶¶ 10-13, Doc. # 69 at 6, ¶ 10.) Furthermore, even if Defendants had falsely accused Plaintiff of being solely responsible, that would not constitute an adverse employment action because it did not constitute a significant change in her employment status.

With respect to Plaintiff's assertion that she was suspended from her job, the evidence shows that Plaintiff was placed on paid leave pending the conclusion of the Human Resources investigation. (Doc. # 69 at 3, ¶ 21.) Being placed on paid leave does not constitute an adverse employment action. *See, e.g.*, *Cisneros v. Colo.,* No. 03-cv-02122, 2007 WL 2746756, at *6 (D. Colo. Sept. 19, 2007) (unpublished) (holding that placement on paid leave did not constitute an adverse employment action because there was no change in his "employment, pay or benefits"); *Nichols v. S. Ill. Univ. – Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2007) (same); *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (same and listing cases).

With respect to Plaintiff's allegation that Defendants falsely accused her of gross misconduct, a comparison of Plaintiff's badge records, which show the time she actually arrived and departed from work each day, with the time Plaintiff reported on the City's KRONOS system, shows that Plaintiff reported that she worked at least 153.8 more hours than she actually did. In addition, Defendants have produced evidence showing that, in approximately a four month time span, Plaintiff had more than 80,000 internet hits to websites unrelated to her job. (Doc. # 60, ¶¶ 26-27.) Although Plaintiff denies that she lied about her time records and internet usage, other than her self-serving affidavit, she provides no evidence to counter or explain the evidence submitted by Defendants. *See Garret v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) ("We do not consider conclusory and self-serving affidavits.").

With respect to Plaintiff's assertion that she received a poor job evaluation, such an evaluation is not an adverse employment action unless it causes a significant change in employment status. *See, e.g., Paige v. Donovan,* No. 09-cv-01811, 2011 WL 5520298, at *7 (D. Colo. Nov. 14, 2011) (unpublished) ("Placement on a performance plan or a negative review, standing alone, is not an adverse employment action" unless it "effects a significant change in the plaintiff's employment status") (internal quotations omitted); *Weil v. Carecore Nat., LLC*, --- F. Supp. 2d ---, 2011 WL 2415791, at *8 (D. Colo. June 14, 2011) (finding that written warning was not adverse employment action because it had minimal effect on the plaintiff's employment status). Because Plaintiff retired before receiving her formal evaluation, the repercussions of the negative evaluation are unknown. However, there is no evidence that the failing PEPR was the equivalent of termination, or that it had any effect on her job status. Thus, the PEPR was not an adverse employment action.

Finally, Plaintiff also claims that she suffered an adverse employment action because she was constructively discharged. However, to succeed on a constructive discharge theory, Plaintiff must show that Defendants' actions were not merely adverse, but were intolerable. *See, e.g.*, *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 805-06 (10th Cir. 2007) (female employee not constructively discharged, despite evidence the Defendant consistently subjected female employees to derogatory and explicit comments); *Exum v. U.S. Olympic Comm*., 389 F. 3d 1130, 1135 (10th Cir. 2004) (stating that a constructive discharge occurs "when an employer, through unlawful acts,

makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.").

Although Plaintiff is correct that the occurrence of constructive discharge is a question of fact normally reserved for the jury, *see Strickland v. United Parcel Services, Inc.*, 555 F.3d 1224, 1228-29 (10th Cir. 2009), in this case, Plaintiff's evidence is insufficient to show that she was constructively discharged. There is no evidence that Defendants' conduct was unlawful or that the working conditions at DIA were so intolerable that a reasonable jury could find that Plaintiff was forced to resign. *See, e.g.*, *Petersen,* 301 F.3d at 1190 (finding that the plaintiff failed to establish constructive discharge because she did not present specific evidence showing the discrimination was unlawful or intolerable).

Even assuming *arguendo* that Plaintiff suffered an adverse employment action, she also fails to provide any evidence that she was treated differently than other similarly situated employees. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala,* 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997)). In determining whether two employees are similarly situated, a court must "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id.* Moreover,

even employees who are similarly situated must have been disciplined for conduct of “comparable seriousness” in order for their disparate treatment to be relevant. *Id.*

Plaintiff claims that she was treated differently than Ms. Blu, who was also supervised by Defendant Wood and who suffered none of the purported adverse employment actions. (Doc. # 60, ¶ 28.) However, Plaintiff and Ms. Blu were not similarly situated. Although Plaintiff disputes that she was the “Grant Administrator,” Plaintiff herself produced a document which clearly identified her as the “Grant Administrator” and Ms. Blu as a “Management Analyst III.” (Doc. # 62-1 at 5.)

Even assuming that Ms. Blu was in a similar job position to that of Plaintiff, there is no evidence that Ms. Blu’s job performance was deficient. The Performance Report for the AIP criticizes the “Grant Administrator” multiple times for deficient performance, but does not mention Ms. Blu, or the “Management Analyst III.” (Doc. # 60-20.) In addition, there is no evidence that Ms. Blu demonstrated misconduct similar to that of Plaintiff (*e.g.,* falsifying time records, difficult to find at work, rude to her supervisors, and misuse of the internet). Thus, Plaintiff has failed to establish a *prima facie* case for racial discrimination.

**B. RETALIATION CLAIM**

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) she was engaged in protected activity; (2) suffered an adverse employment action; and, (3) there was a causal connection between the protected activity and the adverse

action. *Mathews v. Denver Newspaper Agency, LLP*, 649 F.3d 1199, 1210 (10th Cir. 2011).

Plaintiff alleges she engaged in protected activity in August and September of 2010, when she allegedly told multiple individuals, including Defendant Wood, that she believed she was being discriminated against on the basis of race. (Doc. # 61 at 3-4, ¶¶ 14-20.) Such informal complaints to superiors may constitute protected activity. *See O'Neal v. Ferguson Const. Co.,* 237 F.3d 1248, 1255 (10th Cir. 2001). Construing the evidence in the light most favorable to Plaintiff, the Court will assume Plaintiff did, in fact, inform these individuals that she believed she was being discriminated against. However, Plaintiff must also produce evidence demonstrating that Defendant Wood took an adverse employment action against her that was motivated by her protected activity. *See, e.g.*, *Petersen*, 301 F.3d at 1189 (finding that the plaintiff had failed to establish a prima facie case of retaliation because she failed to provide evidence establishing that the adverse employment action was motivated by her "good-faith belief" that Title VII had been violated).

The Court has already determined Plaintiff did not suffer any adverse employment actions. Additionally, she has failed to present any evidence that the purported adverse employment actions were motivated by her protected activity. Thus, Plaintiff has failed to establish a *prima facie* case for retaliation and summary judgment must be granted on this claim.

**C. ADEA CLAIM**

To establish a *prima facie* case of age discrimination in violation of the ADEA, Plaintiff must show that she was: (1) within the protected class of individuals 40-years old or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

Defendants argue that Plaintiff does not establish a *prima facie* case for age discrimination because she fails to show she was performing satisfactory work or that she was terminated from employment. The Court agrees. First, Plaintiff was not performing satisfactory work as indicated by the fact that her annual performance evaluation in 2010 was expected to be failing.[6] She concedes that she was, at the least, partly responsible for DIA missing the deadlines to submit the 1512 report to the FAA, and she acknowledges that DIA's failure to submit this report was "a big deal." (Doc. # 61 at 2-3, ¶¶ 10-12.) As the Court has already discussed, Defendants produced evidence showing that Plaintiff lied about her time records and spent excessive time on the internet. Additionally, Plaintiff's annual performance evaluation was expected to be "failing." (Doc. # 60-35.) Thus, Plaintiff has not established that she was performing satisfactory work at the time she retired. Moreover, Plaintiff was not terminated from her

[6] Although Plaintiff had received positive performance evaluations in the past, such prior performances do not, by themselves, demonstrate that Plaintiff was adequately performing her job in 2010. *See Eilam v. Children's Hosp. Ass'n*, 1999 WL 176128, at *4 (10th Cir. Mar. 31, 1999) (unpublished).

employment; rather, she retired.[7] (Doc. # 60, ¶ 1.) Thus, the Court finds that Plaintiff has failed to establish a *prima facie* case of age discrimination.

## IV. CONCLUSION

Based on the evidence in the record, Plaintiff has not shown that there exists a genuine dispute of material fact for trial because she has failed to establish a *prima facie* case on any of her claims.

Accordingly, IT IS ORDERED THAT Defendants' Motion for Summary Judgment (Doc. # 60) is GRANTED.

It is FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE. The Final Trial Preparation Conference set for August 3, 2012, and the five-day Jury Trial set to commence on August 20, 2012, are VACATED.

It is FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment. Each party shall bear its own attorneys' fees.

DATED: June 15, 2012

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

[7] For the reasons already discussed, the Court rejects Plaintiff's theory of constructive discharge.